321 F.3d 316
 NEW YORK PUBLIC INTEREST RESEARCH GROUP, Petitioner-Appellant,
v.
Christine Todd WHITMAN, in her capacity as Administrator, U.S. Environmental Protection Agency, and Jane Kenny, in her capacity as Regional Administrator, Region 2, U.S. Environmental Protection Agency, Respondents-Appellees,
State of New York and Erin Crotty, Commissioner of the New York Department of Environmental Conservation, Intervenors.
 No. 02-4033.
 No. 02-4073.
 No. 02-4075.
 No. 02-4077.
 United States Court of Appeals, Second Circuit.
 Argued: November 20, 2002.
 Decided: February 27, 2003.
 
 COPYRIGHT MATERIAL OMITTED James B. Kobak, Jr., Hughes, Hubbard & Reed, LLP, New York, NY (Adam Brodsky, of counsel, Keri Powell, Earthjustice, Washington, D.C., on the brief), for Petitioner-Appellant.
 Joshua M. Levin, Environmental Defense Section, Environmental Resources Division (Apple Chapman, Office of General Counsel, U.S. Environmental Protection Agency, Eileen T. McDonough, Environmental Defense Section, on the brief for Thomas L. Sansonnetti, Assistant Attorney General, Environment and Natural Resources Division), Washington, D.C., for Respondents-Appellees (02-4033).
 Eileen T. McDonough, Environmental Defense Section, Environmental Resources Division (Apple Chapman, Office of General Counsel, U.S. Environmental Protection Agency, Joshua M. Levin, Environmental Defense Section, on the brief for Thomas L. Sansonnetti, Assistant Attorney General, Environment and Natural Resources Division), Washington, D.C., for Respondents-Appellees (02-4077). Rachel Zaffrann, Assistant Attorney General, New York State Attorney General's Office, Environmental Protection Bureau, for Eliot Spitzer, Attorney General, State of New York, New York, NY, for Intervenors.
 Before: F.I. PARKER, STRAUB, and B.D. PARKER, Circuit Judges.
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 These challenges by the New York Public Interest Research Group ("NYPIRG") to final decisions by the United States Environmental Protection Agency ("EPA") call upon us to clarify certain aspects of federal oversight authority in the cooperative state/federal regulatory scheme established by the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q. Generally speaking, we must determine whether the EPA responded appropriately after it was alerted to deficiencies in New York's program for issuing permits to major stationary sources of air pollution.
 
 
 2
 Title V of the CAA requires these sources to receive operating permits and authorizes the EPA to approve and monitor state-run permitting programs. NYPIRG seeks review of several final rulings by the EPA, approving the program administered by the State of New York and the New York Department of Environmental Conservation ("DEC").
 
 
 3
 Although the EPA was aware that New York's Title V program was deficient in certain respects, the EPA gave it final approval because the DEC had corrected all the deficiencies originally identified by the EPA when the program was granted interim approval. See 66 Fed.Reg. 63180 (Dec. 5, 2001); 67 Fed.Reg. 5216 (Feb. 5, 2002). NYPIRG contends that a state's permitting program may not be finally approved if it is defective, no matter when the deficiencies are identified. NYPIRG further contends that, even if full approval was proper, the EPA was required by the CAA to issue a Notice of Deficiency ("NOD") to the DEC based on the deficiencies. The EPA, on the other hand, claims that it was entitled to use its discretion under the CAA to forego the NOD procedure, particularly in light of the DEC's commitment to remedy the existing deficiencies. Finally, NYPIRG contends that the EPA violated its obligation under the CAA to object to defective permits issued by the DEC to three facilities-Albert Einstein College of Medicine at Yeshiva University, Action Packaging Corporation, and Kings Plaza Total Energy Plant-and instead erroneously fashioned a rule excusing objections to deficiencies determined by the EPA to be harmless.
 
 
 4
 We affirm the EPA's decision to approve New York's Title V permit program, as well as its decision not to issue a NOD. However, we vacate the EPA's decision not to object to the three draft permits and remand that issue to the EPA for further proceedings.
 
 I. Background
 A. The Clean Air Act
 
 5
 What we first observed two decades ago remains true today: "Few statutes present more complex problems for the nation's courts than" the CAA, "designed to safeguard our precious air resources. And, fewer are more important." Connecticut v. EPA, 696 F.2d 147, 151 (2d Cir.1982). The CAA, signed into law by President Lyndon Johnson in 1963, was the nation's first modern environmental law. See S.Rep. No. 228, 101st Cong., 2d Sess. 13 (1989), at 1, reprinted in 1990 U.S.C.C.A.N. 3385, 3387. It is an intricate regulatory regime intended to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). As part of its "bold experiment in cooperative federalism," Connecticut, 696 F.2d at 151, the CAA places the primary responsibility for enforcement on state and local governments, but it also provides for "Federal financial assistance and leadership ... for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(3), (4).
 
 
 6
 In 1990, Congress added Title V to the Act, which requires major stationary sources of air pollution to receive operating permits incorporating CAA requirements and establishes a procedure for federal authorization of state-run Title V permitting programs. See 42 U.S.C. §§ 7661-7661f. Title V permits do not impose additional requirements on sources but, to facilitate compliance, consolidate all applicable requirements in a single document. See 42 U.S.C. § 7661a(a); Virginia v. Browner, 80 F.3d 869, 873 (4th Cir.1996) (Title V permit "is a source-specific bible for Clean Air Act compliance.").
 
 B. New York's Title V Permit Program
 
 7
 Section 502(d)(1) of the CAA authorizes the EPA to approve permit programs meeting Title V's requirements. 42 U.S.C. § 7661a(d)(1). The CAA directs the EPA to promulgate regulations setting forth the minimum elements of a state permit program, which must include certain requirements identified in the Act. 42 U.S.C. § 7661a(b). Congress established a multi-step process leading to the EPA's approval of state programs. The process incorporates firm deadlines. See 42 U.S.C. § 7661a(d). Pursuant to this statutory schedule, programs were to begin operating no later than November 16, 1996, six years after Title V became law. In the event that a program was not approved by that date, the CAA contemplated stiff sanctions. The state would be exposed to financial penalties, including the loss of federal highway funds. See 42 U.S.C. §§ 7661a(d)(2)(B) and 7509(b). The EPA, moreover, would be required to implement a federal Title V permitting program in that state, pursuant to the EPA's regulations in 40 C.F.R. § 71. See 42 U.S.C. § 7661a(d)(3).
 
 
 8
 New York, through the DEC, submitted its Title V program to the EPA for approval in November 1993. On November 7, 1996, shortly before the statutory deadline for either the granting of full approval or the assumption of permitting responsibilities by the EPA, the EPA granted New York "interim approval"—a procedure provided for by the CAA—determining that "the State has demonstrated that the program substantially meets the minimum requirements for an interim State operating permits program." 61 Fed.Reg. 57589, 57592.
 
 
 9
 Under the CAA, interim approval "shall expire ... not later than 2 years after such approval, and may not be renewed." 42 U.S.C. § 7661a(g). When the EPA granted interim approval, it identified eight deficiencies that needed to be addressed so that a fully approved program could be in place by the expiration of interim approval.[1] Notwithstanding its awareness of the statutory deadlines, the EPA disregarded them and repeatedly extended interim approval of New York's program, as well as those of other states across the country. See 61 Fed.Reg. 56368 (Oct. 31 1996); 62 Fed.Reg. 45732 (Aug. 29, 1997); 65 Fed.Reg. 7333 (Feb. 14, 2000). New York's last extension occurred on May 22, 2000, when it was extended until December 1, 2001. See 65 Fed.Reg. 32035. In response to this practice, NYPIRG and the Sierra Club filed a petition for review in the United States Court of Appeals for the District of Columbia Circuit, challenging the legality of these extensions. See Sierra Club v. EPA, No. 00-1262 (D.C.Cir.). This lawsuit was settled in November 2000. In the settlement agreement, the EPA committed to start operating permitting programs under its own regulations by December 1, 2001, for each state not fully approved by that date.
 
 
 10
 Pursuant to the agreement, the EPA also published a Federal Register notice on December 11, 2000, inviting public comment on deficiencies in state Title V programs and committing to issue a NOD "for any claimed shortcoming in an operating permits program that [the EPA agreed] constitutes a `deficiency' within the meaning of [40 C.F.R.] part 70." 65 Fed.Reg. 77376, 77377 (Dec. 11, 2000). On March 11, 2001, NYPIRG, a nonprofit group consisting mainly of college students organized to advocate for issues concerning the environment and public health, responded to the EPA's invitation for public comment by submitting an extensive discussion of perceived shortcomings in New York's permit program, under which permits had been issued pursuant to the EPA's November 7, 1996 grant of interim approval. In its letter, NYPIRG identified nine alleged deficiencies-which, are with minor exceptions, the same perceived problems at issue in these appeals-and requested the issuance of a NOD to the DEC.[2] On October 25, 2001, however, the EPA published a proposed full approval of New York's program based on its determination that the eight deficiencies identified at the time of interim approval no longer existed. The EPA requested comments but noted that they should be limited to the "eight specific issues that were addressed pursuant to EPA's November 7, 1996 interim approval of the New York State operating permits program." 66 Fed.Reg. 53966 (Oct. 25, 2001). On November 23, 2001, NYPIRG again submitted comments to the EPA, discussing essentially the same alleged deficiencies raised in its March 11, 2001 letter of comment.
 
 
 11
 Notwithstanding NYPIRG's identification of these alleged deficiencies, on December 5, 2001, the EPA published a notice of final rulemaking, granting contingent full approval to New York's program. 66 Fed.Reg. 63180 (Dec. 5, 2001). In this notice, the EPA reiterated that the eight deficiencies identified at the time of interim approval no longer impeded full approval. In addressing NYPIRG's comments, the EPA acknowledged "that issues other than those listed in the November 7, 1996 interim approval may exist in the New York program" but concluded that "newly identified deficiencies that may exist" do not prohibit full approval. Id. at 63181. Discussing the statutory provisions of the CAA governing both full and interim approval, the EPA further concluded that "the appropriate and more cohesive reading of the statute recognizes EPA's authority to grant New York full approval in this situation while working simultaneously with the state, in its oversight capacity, on any additional problems that were recently identified." Id. at 63182. The EPA's full approval remained "contingent" pending the permanent implementation by New York of certain emergency rules promulgated to bring it into compliance with the CAA and the EPA's regulations. After these rules became permanent, the EPA granted New York final full approval. 67 Fed.Reg. 5216 (Feb. 5, 2002).
 
 
 12
 Under the EPA's interpretation of the statutory provisions governing interim and full approval, CAA § 502(g), which governs interim approval, provides an alternate path to full approval. Full approval would otherwise be governed by CAA § 502(d) and would not be permitted when the EPA determined that the program did not meet all the requirements of Title V. According to the EPA's interpretation, if a state has been granted interim approval, to receive full approval it need only remedy deficiencies identified by the EPA at the time of interim approval.
 
 
 13
 NYPIRG disputes this interpretation, contending that, when the EPA is aware of deficiencies, it may not fully approve a program, regardless of whether it becomes aware of the deficiencies before or after interim approval. In NYPIRG's view, in other words, there is only one path to full approval. It is set forth in § 502(d) and permits approval only of a deficiency-free program.
 
 C. Notice of Deficiency ("NOD")
 
 14
 The CAA provides that "[w]henever [the EPA] makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, [the EPA] shall provide notice to the State." 42 U.S.C. § 7661a(i)(1). This "notice" is the NOD. Upon issuance of a NOD, sanctions such as the loss of federal highway funds may be imposed on the state. Unless the state corrects the deficiencies within 18 months, the EPA is required to take over and administer the program pursuant to its Part 71 regulations. 42 U.S.C. § 7661a(i)(4).
 
 
 15
 Shortly after publication of contingent full approval, the EPA also responded to NYPIRG's March 11, 2001 comments and request for the issuance of a NOD. The EPA concluded that these comments did not identify problems with New York's statutes or regulations related to the Title V permit program but simply alleged deficiencies with the "implementation" of the program. The EPA stated that these "implementation deficiencies" had been addressed by the DEC in a November 16, 2001 letter in which the DEC committed to make "certain implementation changes" that would rectify the concerns identified by NYPIRG. The EPA committed to monitor the DEC's compliance over the next six months and agreed that if the changes were made, no NOD would issue.
 
 
 16
 Although deciding to rely on the DEC's letter of commitment, the EPA proceeded to address each of the issues raised by NYPIRG and, in large part, agreed that it had identified issues requiring correction. With respect to NYPIRG's assertion, for example, that the DEC had failed to comply with the requirement that each permit be accompanied by a "statement of basis," setting forth the legal and factual basis for each draft permit condition as required by 40 C.F.R. § 70.7(a)(5), the EPA agreed "that DEC had not properly been implementing this requirement." The EPA published this response on February 13, 2002.
 
 
 17
 NYPIRG asserts that the EPA was not entitled to rely on an informal commitment by the DEC to address the so-called "implementation deficiencies" but was required by the CAA to utilize the formal NOD procedure after it concluded that New York's program was deficient.
 
 D. Draft Permits
 
 18
 Although, as noted, New York's permit program was granted only interim approval in November 1996, it had the authority (by December 1996) to accept permit applications and issue Title V permits. The CAA requires that a state permitting program provide an opportunity for public comment on draft permits before they are issued. 42 U.S.C. § 7661a(b)(6). After considering public comments, the state permitting authority must give the EPA 45 days to review and to object to a permit that does not meet the requirements of Title V. 42 U.S.C. § 7661d(b)(1); 40 C.F.R. § 70.8(c).
 
 
 19
 If the EPA does not object to a proposed permit within the 45 days, "any person" may petition the EPA to object to the permit. 42 U.S.C. § 7661d(b)(2). This petition must be filed within 60 days of the expiration of the EPA's 45-day period and based on objections "raised with reasonable specificity during the public comment period...." Id. The EPA must act on the petition within 60 days and "shall issue an objection within such period if the petitioner demonstrates to [the EPA] that the permit is not in compliance with the requirements of this chapter, including the requirements of the applicable implementation plan." Id.
 
 
 20
 Three draft permits, which were released by the DEC in the summer of 1999, are at issue. These permits were issued for: (1) Albert Einstein College of Medicine at Yeshiva University ("Yeshiva University"); (2) Action Packaging Corporation ("Action Packaging"); and (3) Kings Plaza Total Energy Plant ("Kings Plaza"). Yeshiva University is required to obtain an operating permit for four boilers, which vent to a single stack and burn fuel oil or natural gas to provide heat and steam to the school. Action Packaging is required to obtain an operating permit because of emissions resulting from a plastic-bag manufacturing operation. After the bags are printed in solvent-based inks, they are processed through a drying oven. The exhaust from this oven is passed through a natural-gas-fired catalytic incinerator. Kings Plaza provides heating, cooling and electrical power for a shopping center and a marina and is required to obtain an operating permit for three emission units.
 
 
 21
 In July 1999, during the public comment period, NYPIRG identified the same deficiencies in the draft permits for these three facilities that it contends are present in New York's program as a whole. In response to these comments, the DEC made a few changes, rejected most objections, and forwarded the petitions to the EPA. The EPA's review period expired without objection. NYPIRG then petitioned the EPA in the spring of 2000 to object to each permit.
 
 
 22
 Although the EPA was required by statute to respond in 60 days, it waited nearly two years to respond and eventually did so only after NYPIRG filed suit. See NYPIRG v. EPA, No. 00-9394 (S.D.N.Y.). The EPA denied the Yeshiva University petition in its entirety and denied all but a few narrow issues of the Action Packaging and Kings Plaza petitions. The EPA's order declining to object to the permits acknowledged the existence of many of the problems identified by NYPIRG. For example, the EPA responded to NYPIRG's claim that the DEC violated the public participation requirement of 40 C.F.R. § 70.7(h)-by failing to give notice of the procedures by which a public hearing may be requested-by acknowledging that "[p]etitioner is correct that technically this is a defect in the DEC's public notice procedure for this permit." But it declined to object because "there is no allegation that NYPIRG was harmed as a result of DEC's failure to indicate the procedures that must be followed to request a hearing." The EPA takes the position that, in declining to object, it was entitled to rely upon what it terms a "harmless error rule" imbedded (or implicit) in the statutory scheme. NYPIRG contends that the statute does not permit the EPA to weigh whether deficiencies it has identified are "harmless" and, if deficiencies are identified, the sanctions prescribed by the statute become mandatory.
 
 II. Discussion
 A. Jurisdiction and Standard of Review
 
 23
 In the Title V case, NYPIRG appeals the EPA's refusal to issue a NOD (02-4033; 4075)[3] and the EPA's final full approval of New York's Title V program (02-4073). In the draft permit case (02-4077), NYPIRG appeals the EPA's decision not to object to the three permits. See 67 Fed.Reg. 8016. Since each appeal results from final agency action, we have jurisdiction pursuant to CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1).
 
 
 24
 Because the CAA sets forth no independent standard of review, see CAA § 307, 42 U.S.C. § 7607, we review the EPA's actions pursuant to the Administrative Procedure Act ("APA"). See 5 U.S.C. § 706; see also LaFleur v. Whitman, 300 F.3d 256, 267 (2d Cir.2002). Under the APA, we must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the agency action is based on an interpretation of its governing statute, we must consider whether that interpretation is entitled to deference and, if so, how much. See United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (mandatory deference); Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (deference according to persuasiveness).
 
 
 25
 We will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent. See Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778 (stating that if statute speaks clearly "to the precise question at issue," we "must give effect to the unambiguously expressed intent of Congress"); Barnhart v. Walton, 535 U.S. 212, 217-18, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (same). When the question is not one of the agency's authority but of the reasonableness of its actions, the "arbitrary and capricious" standard of the APA governs. See generally Arent v. Shalala, 70 F.3d 610, 614-16 (D.C.Cir.1995) (discussing relationship between Chevron and the APA); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (applying arbitrary and capricious standard).
 
 B. Standing
 
 26
 Although we are ultimately convinced that NYPIRG has standing, its allegations of standing pose questions sufficiently important for us to have raised the question nostra sponte, because we have an independent obligation to ensure that standing exists. See LaFleur, 300 F.3d at 268. Typically, an environmental advocacy association asserts that the challenged actions resulted in injury by exposing its members to increased pollutants. NYPIRG's allegations of injury, however, concern increased health-related uncertainty resulting from the EPA's failure to enforce the CAA. We have not previously considered whether such allegations suffice.
 
 
 27
 The applicable test for associational standing under Article III was stated in Hunt v. Washington State Apple Advertising Commission:
 
 
 28
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 29
 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
 
 
 30
 Only the first of these requirements-whether the members of NYPIRG would have standing-is in question. "Three elements comprise the `irreducible constitutional minimum of standing.'" LaFleur, 300 F.3d at 269 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
 
 
 31
 First, the party seeking judicial resolution of its claim must have suffered an injury-in-fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. A "particularized" injury is one that affects the plaintiff in a personal and individual way. Second, there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 32
 LaFleur, 300 F.3d at 269 (emphasis, internal quotations, and citations omitted).
 
 
 33
 NYPIRG's members each claim to reside within a few miles of a facility that is required to obtain a Title V permit. Two claim to reside within a few miles of one or more of the specific facilities in the related permit case. Each expresses concerns that if the Title V permits do not comply with the CAA, he or she will not know whether the nearby facility is in compliance with applicable requirements or is emitting pollutants in excess of legal levels.
 
 
 34
 The Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver they use the affected area and are persons `for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). We are persuaded that NYPIRG's members' allegations about the health effects of air pollution and of uncertainty as to whether the EPA's actions expose them to excess air pollution are sufficient to establish injury-in-fact, given that each lives near a facility subject to Title V permitting requirements.
 
 
 35
 It is true, of course, that NYPIRG differs somewhat from the plaintiffs in Laidlaw and LaFleur. Although plaintiffs in those cases alleged actual exposure to excess pollutants, see Laidlaw, 528 U.S. at 184, 120 S.Ct. 693 (allegations concerning the discharge of "pollutants in excess of permit limits"); LaFleur, 300 F.3d at 270 (alleging exposure to increased air-pollutant emissions), NYPIRG alleges personal and economic injury caused by uncertainty. We think, however, this distinction is a superficial one that does not change the injury-in-fact analysis. In other words, the distinction between an alleged exposure to excess air pollution and uncertainty about exposure is one largely without a difference since both cause personal and economic harm. To the extent that this distinction is meaningful, it affects the extent, not the existence, of the injury. To be sure, an individual may well be more likely to live with uncertainty as opposed to certainty about exposure to excess levels of air pollution. But such marginal differences are not meaningful in assessing allegations of injury-in-fact since "the injury-in-fact necessary for standing `need not be large, an identifiable trifle will suffice.'" LaFleur, 300 F.3d at 270-71 (quoting Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 557 (5th Cir.1996)).
 
 
 36
 The fact that NYPIRG does not allege ongoing exposure to excessive or increased emissions levels could, in other contexts, implicate the other prongs of the standing test: redressability and immediacy. But in this case, NYPIRG's allegations of administrative failure are sufficiently concrete in the context of the final approval and NOD challenges to establish actual or imminent, rather than purely conjectural, injury. These allegations are also sufficient to establish causation, as the exposure to potentially excessive pollutants will likely be redressed by a favorable decision in this lawsuit. Moreover, as to the permit challenge, because NYPIRG properly asserts a violation of a specific procedural right under § 505(b)(2), a lesser showing of immediacy and redressability is required:
 
 
 37
 The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.
 
 
 38
 Lujan, 504 U.S. at 573 n. 7, 112 S.Ct. 2130.
 
 
 39
 Accordingly, we conclude that NYPIRG has constitutional standing to pursue this appeal.
 
 C. Ripeness and Mootness
 
 40
 In addition to standing, the DEC raises related but analytically distinct ripeness and mootness concerns. The DEC claims that (1) NYPIRG's appeal is not ripe because the EPA is still evaluating New York's compliance and has not finally determined whether a NOD should issue; and (2) NYPIRG's appeal is moot because the DEC has committed to correct, and has corrected, the deficiencies in New York's program.
 
 
 41
 "The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur, depending on the final administrative resolution." Dougherty v. Town of N. Hempstead Bd. of Zoning, 282 F.3d 83, 90 (2d Cir.2002) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). We see little reason to question the ripeness of the EPA's decision not to issue a NOD. To be sure, in denying the NOD, the EPA did imply that it would reevaluate the DEC's compliance at some point in the future. But this was merely the consequence of the EPA's interpretation, challenged by NYPIRG, that, when it is alerted to deficiencies in a state-run Title V program, the CAA confers discretion whether to issue a NOD. The existence of such discretion poses a purely legal question of statutory interpretation that is properly before the court and is ripe for review. See Natural Res. Def. Council v. EPA, 22 F.3d 1125, 1133 (D.C.Cir.1994) (per curiam).
 
 
 42
 The DEC also contends that NYPIRG's claims were mooted by the DEC's letter of commitment which brought the program into compliance by identifying both the actual changes made by the State as well as the changes it intended to make. Laidlaw sets forth the appropriate standard for evaluating such mootness claims. Ordinarily, the Court noted, a party's "voluntary cessation of allegedly unlawful conduct... does not suffice to moot a case." 528 U.S. at 174, 120 S.Ct. 693. Accordingly, a party "claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 190, 120 S.Ct. 693.
 
 
 43
 Attempting to meet this burden, the DEC points to the implementation of a number of the changes promised in its letter of commitment. Although indicative of a degree of good faith, we nevertheless conclude that the DEC has not carried the formidable burden of making "absolutely clear," id. at 190, 120 S.Ct. 693, that the problems identified both by NYPIRG and the EPA "could not reasonably be expected to recur." Id. at 193, 120 S.Ct. 693 (citing United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)).
 
 D. Final Full Approval
 
 44
 We now return to the main statutory questions posed by this appeal and examine first the EPA's full approval of New York's Title V program. As previously discussed, the EPA fully approved the program notwithstanding its agreement with NYPIRG that deficiencies (which the EPA characterizes as "implementation deficiencies") remained in the program. The EPA interpreted Title V and its regulations as prescribing two independent paths to full approval. Basically, it contends that although CAA § 502(d) governs full approval of state programs that have not received interim approval, once a state has received interim approval under § 502(g), to gain full approval it need only make the changes specified at the time of interim approval. NYPIRG insists that there is only one path to full approval, set forth in § 502(d), which prohibits full approval of a program deficient in any manner, regardless of when the deficiencies are identified. The relevant language of CAA § 502(d) provides:
 
 
 45
 (1) Not later than 3 years after November 15, 1990, the Governor of each State shall develop and submit to the Administrator a permit program under State or local law or under an interstate compact meeting the requirements of this subchapter .... Not later than 1 year after receiving a program, and after notice and opportunity for public comment, the Administrator shall approve or disapprove such program, in whole or in part. The Administrator may approve a program to the extent that the program meets the requirements of this chapter, including the regulations issued under subsection (b) of this section. If the program is disapproved, in whole or in part, the Administrator shall notify the Governor of any revisions or modifications necessary to obtain approval. The Governor shall revise and resubmit the program for review under this section within 180 days after receiving notification.
 
 
 46
 42 U.S.C. § 7661a(d).
 
 
 47
 CAA § 502(g), which governs interim approval, in part provides:
 
 
 48
 If a program (including a partial permit program) submitted under this subchapter substantially meets the requirements of this subchapter, but is not fully approvable, the Administrator may by rule grant the program interim approval. In the notice of final rulemaking, the Administrator shall specify the changes that must be made before the program can receive full approval.
 
 
 49
 42 U.S.C. § 7661a(g).
 
 
 50
 Ambiguity exists in these provisions. It arises because the text of § 502(g), governing interim approval, does not clearly describe the process by which a permit program that has received interim approval receives full approval. After making the changes specified at the time of interim approval, must the state resubmit its plan for evaluation under the standards set forth in § 502(d), which would require the EPA to reexamine the program's compliance with Title V? Or does a state's program automatically qualify for full approval when the state makes "the changes" specified at the time of interim approval?
 
 
 51
 The EPA itself noted this ambiguity when fully approving New York's Title V program:
 
 
 52
 [A]n apparent tension exists between these two statutory provisions. Standing alone, section 502(d) appears to prevent EPA from granting a state operating permit program full approval until the state has corrected all deficiencies in its program no matter how significant, and without consideration as to when such deficiency was identified. Alternately, section 502(g) appears to require that EPA grant a state program full approval if the state has corrected those issues that the EPA identified in the final interim approval. The central question, therefore, is whether New York by virtue of correcting the deficiencies identified in the final interim approval is eligible at this time for full approval, or whether New York must also correct any new or recently identified deficiencies that may exist as a prerequisite to receiving full approval.
 
 
 53
 66 Fed.Reg. at 63181.
 
 
 54
 With respect to this tension, the EPA concluded:
 
 
 55
 [T]he appropriate and more cohesive reading of the statute recognizes the EPA's authority to grant New York full approval in this situation while working simultaneously with the state, in its oversight capacity, on any additional problems that were recently identified. To conclude otherwise would disrupt the current administration of the state program and cause further delay in the state's ability to issue operating permits to major stationary sources.
 
 
 56
 Id. at 63182.
 
 
 57
 The EPA contends that because this interpretation of ambiguous text is a permissible construction that does not disregard Congress' unambiguously expressed intent, it is entitled to deference pursuant to Chevron, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. In United States v. Mead Corp., the Supreme Court clarified the reach of Chevron, holding that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-27, 121 S.Ct. 2164.
 
 
 58
 Since there is no question that the EPA's interpretation was promulgated in the exercise of rulemaking authority delegated to it by Congress, Mead is satisfied. See Sierra Club v. EPA, 294 F.3d 155 (D.C.Cir.2002) (applying Chevron deference to an EPA interpretation expressed in final rule); cf. Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 490-91 (2d Cir. 2001) (discussing Mead in considering claim under Clean Water Act). The remaining question, given the ambiguity we have identified, is whether the EPA's interpretation is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778.
 
 
 59
 We believe the EPA's interpretation is permissible for several reasons. First, it finds a certain amount of textual support in CAA § 502(g), which provides that in the notice of final rulemaking granting interim approval, the EPA must "specify the changes that must be made before the program can receive full approval." 42 U.S.C. § 7661a(g) (emphasis added). This language suggests that it is the making of the specified changes-as opposed to all possible changes-that triggers full approval.
 
 
 60
 Moreover, the EPA's interpretation comports with the timetable established by Congress, if not adhered to by the EPA. Under § 502(g), interim approval expires after two years and is not renewable.[4] 42 U.S.C. § 7661a(g). Changes identified at the time of interim approval may require modifications of state statutes or regulations and, therefore, may be time consuming. If a state were required, not only to make the changes identified at the start of interim approval but also to correct deficiencies arising during interim approval, a state's efforts to receive full approval could be sabotaged by the identification of new deficiencies during or at the end of interim approval. Should these events occur it is doubtful whether the state could resubmit its plan for full approval since § 502(d) provides that any such submission must occur "[n]ot later than 3 years after November 15, 1990," 42 U.S.C. § 7661a(d)(1), and the statute does not otherwise authorize re-submission.
 
 
 61
 Finally, Title V provides a mechanism, to which we shall shortly turn our attention, to correct deficiencies in a fully approved program. This mechanism is set forth in CAA § 502(i) and provides consequences beginning with a NOD, whenever the EPA "makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof." 42 U.S.C. § 7661a(i)(1). We question whether Congress would have armed the EPA with this arsenal if it believed that every deficiency would be corrected during the interim approval period. In sum, because we believe that the EPA's interpretation of these ambiguous provisions makes a good deal of sense and, in any event, is "a reasonable, hence permissible interpretation of the statute," we affirm its decision fully to approve New York's Title V permit program. Barnhart, 535 U.S. at 224, 122 S.Ct. 1265.[5]
 
 E. Notice of Deficiency ("NOD")
 
 62
 Next, we consider the EPA's obligations under CAA § 502(i) with regard to deficiencies in fully approved programs. As previously noted, the EPA relied on this section's enforcement mechanism as support for its interpretation that it may, in certain circumstances, fully approve programs with identified deficiencies. Section 502(i)(1) provides:
 
 
 63
 Whenever the Administrator makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, the Administrator shall provide notice to the State and may, prior to the expiration of the 18-month period referred to in paragraph (2), in the Administrator's discretion, apply any of the sanctions specified in section 7509(b) of this title.
 
 
 64
 42 U.S.C. § 7661a(i)(1).
 
 
 65
 NYPIRG contends that essentially the same deficiencies that should have prevented full approval-a contention which we have rejected-obligated the EPA to issue a NOD. The EPA does not dispute that New York's program has suffered from "implementation deficiencies" but asserts that it has discretion under the CAA to determine whether the DEC's commitment to address the EPA's concerns excused the need for a formal NOD.
 
 
 66
 In other words, the parties dispute whether § 502(i) obligates the EPA to issue a NOD whenever it is made aware of deficiencies in a state permitting program (presumably even minor or isolated ones) or whether this section affords the EPA discretion to determine whether to engage its formal enforcement mechanism.[6] NYPIRG maintains that because Congress instructed in § 502(i) that whenever deficiencies exist "the Administrator shall provide notice [of Deficiencies]," the EPA has no discretion. See, e.g., United States v. Monsanto, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using the words "shall order" in the statute, "Congress could not have chosen stronger words to express its intent" that the procedure specified in the statute was mandatory). But NYPIRG's fixation on this phrase glosses over the rest of the provision and, in so doing, misreads it.
 
 
 67
 As the EPA correctly notes, the key phrase of § 502(i)(1) is the opening one, "Whenever the Administrator makes a determination," and this language grants discretion. Cf. Her Majesty the Queen v. EPA, 912 F.2d 1525, 1533 (D.C.Cir.1990) (statutory phrase "[w]henever the Administrator... has reason to believe" implies "a degree of discretion"). Presumably, Congress could have fashioned a regime under which, for example, an interested party could initiate the process leading to a determination of whether "a permitting authority is adequately administering and enforcing a program." Congress, however, took a different path. Because the determination is to occur whenever the EPA makes it, the determination is necessarily discretionary.[7]
 
 
 68
 NYPIRG is correct that § 502(i) imposes certain nondiscretionary obligations. Central among these is that, pursuant to § 502(i)(1), after the EPA has made a determination that a program is deficient, it must "provide notice to the State" of this determination. 42 U.S.C. § 7661a(i)(1). But this nondiscretionary obligation only arises after a discretionary determination by the EPA.[8]
 
 
 69
 Accordingly, we conclude that § 502(i) affords the EPA discretion whether to make a determination that a state permitting authority is not adequately administering and enforcing its permitting program. Once that determination is made, certain statutorily mandated consequences, including the issuance of a notice, follow; but the decision whether to make that determination as an initial matter is a discretionary one.
 
 
 70
 This conclusion effectively resolves NYPIRG's challenge to the EPA's decision not to issue a NOD, because under the APA an agency's decision not to invoke an enforcement mechanism provided by statute is not typically subject to judicial review. See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[A]n agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)."); see also Dina v. Attorney Gen. of the United States, 793 F.2d 473 (2d Cir.1986) (per curiam) (U.S. Information Agency's discretionary decision not to recommend waiver of residency requirement is immune from review).
 
 
 71
 The presumption against judicial review of such refusal avoids entangling courts in a calculus involving variables better appreciated by the agency charged with enforcing the statute and respects the deference often due to an agency's construction of its governing statutes:
 
 
 72
 [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with many of the variables involved in the proper ordering of its priorities. Similar concerns animate the principles of administrative law that courts generally will defer to an agency's construction of the statute it is charged with implementing, and to the procedures it adopts for implementing that statute.
 
 
 73
 Heckler, 470 U.S. at 831-32, 105 S.Ct. 1649 (citations omitted).
 
 
 74
 NYPIRG's insistence that the CAA requires a NOD for every deficiency-presumably no matter how slight, isolated or technical-invites most of these problems. Allowing parties outside an agency to trigger its enforcement mechanism would invariably entangle reviewing courts in its internal operations and would involve technical and prudential judgments lying largely outside the expertise of courts. By placing the initiation of enforcement procedures within the agency, Congress left the decision of when and whether they are warranted to the institutional actor best equipped to make it. The EPA's decision not to issue a NOD, appealed in 02-4033 and 02-4075, is, therefore, affirmed.
 
 F. Draft Permit Case
 
 75
 Next, we consider NYPIRG's contention that the EPA improperly failed to object to the three draft Title V permits issued by the DEC to Yeshiva University, Action Packaging and Kings Plaza. Notwithstanding minor differences in the permits, the EPA's actions with respect to each of the petitions raise the identical issue of statutory construction under § 505(b)(2). NYPIRG contends that under that section, the EPA must object to draft permits "if the petitioner demonstrates to the [EPA] that the permit is not in compliance with the requirements of this chapter." 42 U.S.C. § 7661d(b)(2).[9]
 
 
 76
 In its response to NYPIRG's petition and on this appeal, the EPA concedes that the draft permits had not complied with certain provisions of Title V and its corresponding regulations. The EPA contends, however, that, even though the three draft permits did not comply with Title V, objections were unnecessary because it was entitled to rely on a "harmless error rule" and the lack of compliance caused no harm. In responding to NYPIRG's objections to the Kings Plaza permit, for example, the EPA declined to object based upon a deficiency in the public notice procedure, because the deficiency "did not hinder [NYPIRG's] ability to request a hearing on this draft permit."[10] Kings Plaza Order at 4. NYPIRG, on the other hand, contends that the CAA does not require a showing of harm and any showing of noncompliance triggers a nondiscretionary duty to object.
 
 
 77
 The EPA attempts to locate its "harmless error rule" in two places: § 505(b) of the CAA and § 706 of the APA. Because we are unable to find such a rule in either of these locations, we conclude that it does not exist. Focusing on § 505(b)(2), the EPA acknowledges that this subsection imposes a series of obligations, including the requirement that, in response to a petition, the "EPA must decide whether the administrative petitioner has demonstrated that `the permit is not in compliance' with the requirements of statutes that the EPA is charged with interpreting, as well as the Agency's own regulations." EPA Brief (02-4077) at 23 (quoting § 505(b)). But because this decision requires the application of agency expertise, the EPA argues the statute affords it discretion to determine the practical consequences of a specific deficiency, including whether the deficiency is harmless.
 
 
 78
 We think, however, that this argument blurs the important distinction between the discretionary part of the statute (whether the petition demonstrates non-compliance) with the nondiscretionary part (if such a demonstration is made, objection must follow). This is not a case in which the EPA remained unconvinced and thus is not a challenge to its exercise of judgment.[11] Since the EPA has conceded that the draft permits were deficient, it is, instead, a challenge to the EPA's failure to take actions resulting from the judgment it made. But those actions are not discretionary ones since § 505(b)(2) specifies that "the Administrator shall issue an objection" if a demonstration of non-compliance is made.[12]
 
 
 79
 The EPA contends that this requirement is modified by a harmless error rule which is "an integral part of administrative law," EPA Brief (02-4077) at 24, arising from the APA's command that "due account shall be taken of the rule of prejudicial error" by federal courts in reviewing agency action. 5 U.S.C. § 706. But the rule of prejudicial error is quite different from the rule of harmless error that the EPA seeks to apply here. The rule of prejudicial error typically eliminates the necessity of remand following judicial review when the error that the agency has made was not prejudicial and did not impinge on fundamental rights.
 
 
 80
 For example, in Waldron v. INS, 17 F.3d 511 (2d Cir.1994)-the case primarily relied upon by the EPA-we affirmed a decision of the Board of Immigration Appeals, which found an alien deportable, although certain "technical errors" had occurred in the deportation proceedings. Id. at 519. We concluded that "the INS has convincingly demonstrated that Waldron is ineligible for relief from deportation and that a remand of this case to the BIA to correct technical errors that did not affect either the outcome or the overall fairness of the proceeding" was not required "and would be an inappropriate use of limited agency resources." Id.; see also Economic Opportunity Comm'n, Inc. v. Weinberger, 524 F.2d 393, 400 (2d Cir.1975) (rejecting argument that "any procedural infirmity results in arbitrary administrative action which must be set aside by a reviewing court"). The rule of prejudicial error informs our review of an agency's adherence to its statute and regulations; it has never been used to introduce discretion into actions made mandatory by Congress.[13]
 
 
 81
 Finally, we note that the statutory provisions governing the issuance of objections to draft permits differ in crucial respects from those governing the issuance of a NOD. Section 505(b) of the CAA provides a step-by-step procedure by which objections to draft permits may be raised and directs the EPA to grant or deny them, depending on whether non-compliance has been demonstrated. 42 U.S.C. § 7661d(b)(2). Section 502(i), on the other hand, does not compel the EPA to determine whether a permitting authority is adequately administering or enforcing its permitting program, nor does it provide a substantive standard by which this determination is to be made. Moreover, although § 505(b) refers strictly to compliance, § 502(i) refers more broadly to issues of administration and enforcement. These differences further convince us that although the EPA has discretion to determine whether to issue a NOD, it does not have discretion whether to object to draft permits once noncompliance has been demonstrated. We hold, therefore, that once NYPIRG demonstrated to the EPA that the draft permits were not in compliance with the CAA, the EPA was required to object to them. Its failure to do so requires us to vacate its denial of NYPIRG's petitions seeking objections to the draft permits.
 
 G. Relief
 
 82
 NYPIRG requests that we issue detailed instructions regarding the specific objections the EPA must, on remand, make to the three draft permits. We are reluctant, however, to give specific instructions to the EPA in technical areas near the center of the agency's expertise. The more prudent course is to leave this issue at this time to the sound discretion of the EPA. See, e.g., National Tank Truck Carriers, Inc. v. EPA, 907 F.2d 177, 185 (D.C.Cir.1990). Indeed, any efforts in this case to do more could well be futile as many, if not all, of the individual, technical issues presented by the draft permits have either evolved or been resolved altogether during the course of this appeal.
 
 
 83
 Finally, NYPIRG also requests the award of costs, under 42 U.S.C. § 7607(f), which permits an award when the court "determines that such award is appropriate." As NYPIRG first made its request in its reply brief, the EPA has not had an opportunity to respond to it. Moreover, our evaluation of whether an award of costs is appropriate will benefit from a discussion by the parties, particularly in light of the disposition of this appeal. See Ruckelshaus v. Sierra Club, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (holding that, notwithstanding its broad language, 42 U.S.C. § 7607(f) permits the award of costs only to litigants that have achieved at least some success on the merits); see also Sierra Club v. EPA, 769 F.2d 796, 801 (D.C.Cir.1985). We conclude, therefore, that the issue of costs is best handled by motion after the EPA issues a final decision upon remand. See, e.g., Michigan v. United States EPA, 254 F.3d 1087 (D.C.Cir.2001) (per curiam).
 
 CONCLUSION
 
 84
 For the foregoing reasons, NYPIRG's petition for review in the draft permit case (02-4077) is granted. We vacate the EPA's denial of NYPIRG's objections to the Yeshiva University, Action Packaging, and Kings Plaza permits and remand for further proceedings consistent with this opinion. NYPIRG's petitions for review in the Title V cases (02-4033, 02-4073, 02-4075) are denied.
 
 
 
 Notes:
 
 
 [1]
 The EPA also noted that contemplated revisions to its own regulations could effectively moot five of the eight deficiencies. 61 Fed. Reg. 57589
 
 
 [2]
 Seven of these alleged deficiencies remain live issues in the instant appeals: (1) no preparation of a statement of basis; (2) no requirement of prompt reports of deviations; (3) permits fail to set forth adequate conditions governing facility operations during startup, shutdown and malfunction (SSM) episodes; (4) omissions of correct particulate emission limit; (5) incorrect annual compliance certification; (6) no opportunity for a public hearing on draft Title V permits; (7) expiration of pre-existing permit requirements
 
 
 [3]
 NYPIRG appeals from both the EPA's letter denying NOD issuance and the publication of this letter
 
 
 [4]
 The fact that the EPA repeatedly extended its grant of interim approval to New York and other states in apparent violation of this prohibition does not affect our examination of the reasonableness of the EPA's interpretation
 
 
 [5]
 In arguing the unreasonableness of the EPA's interpretation, NYPIRG posits a situation in which, subsequent to a grant of interim approval, a state repealed certain necessary environmental laws or enacted regulations inconsistent with Title V. Under the EPA's interpretation, NYPIRG argues, the state permitting program could receive full approval notwithstanding such acts, if it had merely rectified the problems identified at the time of interim approval. But this situation is not before us. The EPA determined-and this determination seems to be accurate-that the concerns raised by NYPIRG with New York's program were merely "program implementation issues ... that do not indicate an inability of the state's permit preparer to carry out the Act's Title V program because of state law or regulations." Obviously, different results are likely to flow from different facts
 Moreover, under Title V, even after full approval of a state permitting program, the EPA continues to exercise comprehensive oversight authority, including the ability to impose substantial statutory sanctions or to withdraw federal approval of the state program if the state fails to comply with CAA requirements. See 42 U.S.C. § 7661a(i)(1)(2); 40 C.F.R. § 70.10(c). Thus, the attainment of full program approval does not shield the state from further administrative action or enforcement procedures.
 
 
 [6]
 With respect to this issue, we address only the EPA's statutory duty to issue a NOD under § 502(i) and not any separate obligations that the EPA may have incurred through settlement of theSierra Club litigation in the D.C. Circuit-a settlement which, in any event, this court has no jurisdiction to enforce. See Herrick Co. v. SCS Communications, Inc., 251 F.3d 315, 327-28 (2d Cir.2001).
 
 
 [7]
 Courts have interpreted similar statutory provisions in the CAA and other environmental statutes as leaving the decision whether to investigate or initiate enforcement proceedings to agency discretionSee, e.g., City of Seabrook v. Costle, 659 F.2d 1371 (5th Cir. 1981) (CAA § 113(a)(1)); Sierra Club v. Whitman, 268 F.3d 898 (9th Cir.2001) (Clean Water Act § 1319(a)(3)); Dubois v. Thomas, 820 F.2d 943 (8th Cir.1987) (same); Sierra Club v. Train, 557 F.2d 485 (5th Cir.1977) (same); cf. Harmon Cove Condominium Ass'n, Inc. v. Marsh, 815 F.2d 949 (3d Cir.1987) (Federal Water Pollution Control Act § 404).
 
 
 [8]
 The absence of any statutory timelines or procedures for the triggering of such a determination also indicates that this determination rests within the EPA's discretionSee Envtl. Def. Fund v. Thomas, 870 F.2d 892, 897 (2d Cir.1989) (statute including "no stated deadlines" for triggering of action could reasonably be considered as conferring discretion on Administrator whether or not to take the action).
 
 
 [9]
 The EPA's regulations also state that the EPA "will object to the issuance of any proposed permit" if the EPA determines it violates an applicable requirement. 40 C.F.R. § 70.8(c). The arguments concerning this regulation mirror those concerning the statute
 
 
 [10]
 Under the EPA's regulations, a failure to provide notice of a public opportunity for comment and a hearing constitutes grounds for objectionSee 40 C.F.R. §§ 70.7(h), 70.8(c)(3)(iii).
 
 
 [11]
 There clearly issome room for the exercise of agency expertise in § 505(b)(2), which requires petitioner to make a demonstration to the EPA, but none of the questions that could arise under the exercise of the EPA's judgment-such as, perhaps, questions of the burdens facing a petitioner-have arisen in this case.
 
 
 [12]
 Although there is no need in this case to resort to legislative history to divine Congress' intent, the conference report accompanying the final version of the bill that became Title V emphatically confirms Congress' intent that the EPA's duty to object to non-compliant permits is nondiscretionary:
 This section sets out clearly the procedures required of EPA in reviewing permits. Simply put, the Administrator is required to object to permits that violate the Clean Air Act. This duty to object to such permits is a nondiscretionary duty. Therefore, in the event a petitioner demonstrates that a permit violates the Act, the Administrator must object to that permit.
 
 
 [136]
 Cong. Rec. S16,895, S16,944 (1990)
 
 
 [13]
 Moreover, the standard for demonstrating lack of prejudicial error is strict. "Agency mistakes constitute harmless error [under APA § 706] only where they clearly had no bearing on the procedure used or the substance of decision reached."Sierra Club v. U.S. Fish and Wildlife Serv., 245 F.3d 434, 444 (5th Cir.2001) (citation and internal quotation marks omitted). In this case, the EPA's erroneous interpretation of § 505(b) clearly impacted its decision not to object to the draft permits at issue, and thus the EPA's error was, itself, prejudicial.